| | |
|---|---|
| UNITED STATES BANKRUPTCY COURT<br>EASTERN DISTRICT OF NEW YORK | FOR PUBLICATION |

---------------------------------------------------------------x

In re

THE BROWN PUBLISHING COMPANY, DPI LIQUIDATION INC., BROWN MEDIA HOLDINGS COMPANY, BOULDER BUSINESS INFORMATION INC., BROWN BUSINESS LEDGER, LLC, BROWN PUBLISHING INC., LLC, BUSINESS PUBLICATIONS, LLC, THE DELAWARE GAZETTE COMPANY, SC BIZ NEWS, LLC, TEXAS COMMUNITY NEWSPAPERS, INC., TEXAS BUSINESS NEWS, LLC, TROY DAILY NEWS, INC., UPSTATE BUSINESS NEWS, LLC, UTAH BUSINESS PUBLISHERS, LLC, ARG, LLC,

                Debtors.

Chapter 11

Case No. 10-73295- DTE

(Jointly Administered)

---------------------------------------------------------x

THE BROWN PUBLISHING COMPANY LIQUIDATING TRUST,

                Plaintiff,

    -against-

AXA EQUITABLE LIFE INSURANCE COMPANY,

                Defendant.

Adv. Pro. No. 12-8194-DTE

---------------------------------------------------------x

## MEMORANDUM DECISION AND ORDER

Appearances:

        The Law Offices of Sonya J. Brouner
           *Attorneys for Plaintiff*
        By: Sonya J. Brouner, Esq.
        8 Loewen Ct.
        Rye, New York 10580

        Epstein Becker & Green, P.C.
           *Attorneys for Defendant*
        By: Wendy G. Marcari, Esq.
        250 Park Avenue, 11th Floor
        New York, New York 10177-1211

Before the Court is a motion for summary judgment by Defendant AXA Equitable Life Insurance Company ("AXA") to dismiss the Complaint on the basis that AXA was neither the initial transferee, nor the immediate or mediate transferee of the initial transferee of the aggregate total of $300,000 in funds transferred (the "Transfers") by the Debtor, The Brown Publishing Company, with respect to an insurance policy owned by B's Nest Ohio General Partnership (the "Summary Judgment Motion"). The Court has jurisdiction pursuant to 28 U.S.C. § 1334(a) and (b). This contested matter is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (H) and (O) and 11 U.S.C. §§ 502(d), 544(b), 548 and 550.

The Court finds that there are no issues of material fact as the facts are not in dispute. The issues raised are based on the Trust's interpretation of this insurance policy. Therefore, summary judgment is appropriate. After a review of all documents and consideration of the arguments by the parties at a hearing held on May 22, 2013, the Court finds that AXA is not an initial transferee, nor the immediate or mediate transferee under 11 U.S.C. § 550. Accordingly, the Summary Judgment Motion by AXA is granted. The following constitutes the Court's finding of fact and conclusions of law.

## FACTS

The Debtor, The Brown Publishing Company, filed for chapter 11 relief on April 30, 2010 and was the Debtor in Possession. The Plan of Reorganization was confirmed on June 16, 2011, and certain assets of the Debtor, including the right to pursue avoidance actions, was transferred to The Brown Publishing Company Liquidating Trust (the "Trust").

Prior to the bankruptcy filing, on March 18, 2005, AXA issued a Flexible Premium Joint

Survivorship Universal Life Insurance Policy (the "Policy") with a face amount of $3,833,705. The Policy insured the lives of Clarence J. Brown, Jr. and Joyce E. Brown (the "Insureds") and was payable upon the death of the second of the Insureds to die while the Policy was in force. B's Nest Ohio General Partnership ("B's Nest") is the owner of the Policy. B'Nest is not a debtor in this Court. The beneficiary of the Policy is listed as B's Nest but the children of the Insureds, Roy Brown and Clarence "Clancy" Brown, who are the general partners of B's Nest, are the intended and actual beneficiaries of the Policy. Clarence J. Brown. Jr. was the Chairman of the Debtor at the time the Policy was issued. Roy Brown and Clancy Brown are also former officers of the Debtor. The Debtor was not the owner nor beneficiary of the Policy.

The Policy is not a typical insurance policy but a unique contract between AXA and B'Nest. Its terms are clearly spelled out. Not only is a death benefit payable upon death of the second of the Insureds to die but the Policy also acts as an investment vehicle whereby net amounts deposited in B'Nest's policy account (the "Policy Account") at AXA would accumulate interest at rates declared by AXA periodically but at rates not less than 3% per year. The interest credited to the Policy Account would increase the cash surrender value and possibly the death benefit payable under the Policy. Upon the death of both Insureds, the beneficiaries would be entitled to a payment of the greater of (a) the base policy face amount, or (b) a percentage of the amount in the Policy Account which ranges from 168% to 102% depending upon the age of the younger Insured at the beginning of the policy year of determination. Thus, the beneficiaries had the potential of receiving more than the base policy face amount. Payment of the death benefit or the surrender value could be made in a lump sum amount, in installments, monthly life income or remain on deposit with AXA with AXA paying periodic interest.

Pursuant to the terms of the Policy, AXA deducts a premium charge not to exceed 10% from each "premium" payment and the remainder is deposited into the Policy Account. The Policy provides for planned periodic premium payment but the Policy holder may make premium payments at any time and in any amount. The Policy holder may also skip planned periodic payments, although this may have an adverse affect on the duration of the Policy and the Policy's values. If the Policy holder stops paying premiums, insurance coverage would continue for so long as the net value of the policy account is sufficient to cover the monthly deductions. AXA reserves the right to decline premium payments or to return excess amounts that it determines would cause the Policy not to qualify as life insurance under applicable tax law.

In addition, it is agreed under the Policy that AXA may deduct from the funds in the Policy Account certain monthly administrative charges, monthly cost of insurance, and monthly cost of any benefits provided by riders to the Policy. In the first policy year, AXA may deduct $0.1225 for each $1,000 of current base policy face amount plus $20 at the beginning of each policy month. In the second policy year and thereafter, AXA may deduct at the beginning of each policy month $0.1225 for each $1,000 of current base policy face amount plus an amount not to exceed $10.

The Policy holder can give up the Policy for its net cash surrender value before the end of the 20th policy year, subject to a surrender charge. A Policy holder may request a partial net cash surrender value withdrawal but AXA has the right to decline such a request if this would cause the Policy to fail to qualify as life insurance under applicable tax law or if this would cause a decrease in the base policy face amount to less than $200,000. AXA also has the right to defer

payment of any net cash surrender value withdrawal or loan amount for up to six months after AXA receives a request for it. Other than the limited administrative, maintenance and surrender charges specified in the Policy, AXA may not deduct for itself or any other party any amounts from the Policy Account. AXA would periodically compare the amounts in the Policy Account less any outstanding loans and accrued loan interest to determine whether there are sufficient funds to cover the required monthly administrative charges. If the net value of the Policy Account is insufficient to cover the monthly administrative charges, AXA would give notice to the owner that the Policy is in default and give B'Nest a 61-day grace period to cure the default by paying enough to cover the insufficient funds. If no or insufficient payment is made to cover the outstanding administrative charges to maintain the Policy Account, then the Policy would cease and AXA would deduct whatever administrative charges may be due to it pursuant to the Policy terms and send notice that the Policy has ended without value. However, B'Nest could request that the policy benefits be restored within five years if, *inter alia,* either of the Insureds are still alive and the required payment to cover three monthly administrative charges and premium charges are made.

The Policy holder can take loans on the value of the Policy from the Policy Account. However, AXA charges interest on loans taken on the Policy Account. In fact, B's Nest took four loans against the Policy on August 20, 2010, July 14, 2011, August 29, 2011, and February 9, 2012. B's Nest repaid the Policy Account on December 17, 2010 but only repaid $445,174.96 of the $1,075,000 in loans taken against the Policy.

From 2006 to at least 2009, B'Nest received an invoice from AXA on or about December of each year for a premium payment. The Debtor made four payments on behalf of B'Nest, each

in the amount of $75,000, to AXA on account of the Policy on December 22, 2006, December 20, 2007, January 26, 2009, and October 1, 2009. A total of $300,000 has been paid by the Debtor to AXA.

On April 30, 2012, the Trust commenced this adversary proceeding against AXA to avoid $300,000 in payments it received from the Debtor with respect to the Policy from December 22, 2006 through October 1, 2009 claiming that these were fraudulent transfers. The Complaint sets forth causes of action on behalf of the Trust against AXA pursuant to 11 U.S.C. §§ 544(b), 548, 550, 502(d) and (j), setoff and recoupment. AXA filed an Answer on July 13, 2012.

On February 5, 2013, AXA filed this Summary Judgment Motion to dismiss the Complaint on the basis that, even if the Transfers were avoidable under 11 U.S.C. § 544(b) or 548, AXA was neither the initial transferee, nor the immediate or mediate transferee of the initial transferee, of the Transfers within the meaning of 11 U.S.C. § 550. Rather, AXA argues that it was a mere conduit and did not have control over the Transfers and thus, the Trust cannot recover the Transfers from AXA.

The Trust filed opposition to the Summary Judgment Motion arguing that unlike a financial intermediary, AXA was not a mere conduit and did have control over the funds because payment of the Transfers by the Debtor were made directly to AXA, and AXA set restrictions on the Policy holder's ability to get access to the funds in the Policy Account.

## DISCUSSION

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure as made applicable by

Bankruptcy Rule 7056, the Court may award summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."

When no genuine triable issues of material fact exist, the moving party is entitled to judgment as a matter of law and summary judgment should be granted. *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 11 (2d Cir. 1986). The mere production of some evidence in support of the opposing party's position will not justify denial of a summary judgment motion, unless the court finds that there is evidence upon which a jury can properly proceed to find a verdict for the party opposing the motion. *American v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Instead, the opposing party must "set forth specific facts showing that there is a genuine issue for trial." *Williams v. Smith*, 781 F.2d 319, 323 (2d Cir. 1986). A court must always "resolve ambiguities and draw reasonable inferences against the moving party." *Knight v. U.S. Fire Ins. Co.*, 804 F.2d at 11. However, the opposing party may not rely upon "mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Id.,* 804 F.2d at 12.

Section 550(a) of the Bankruptcy Code provides in pertinent part:

> Except as otherwise provided in this section, to the extent a transfer is avoided under section 544, 545, 547, 548, 549, 553(b), or 724(a) of this title, the trustee may recover for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from –
>   (1) the initial transferee of such transferor the entity for whose benefit such transfer was made; or
>   (2) any immediate or mediate transferee of such initial transferee.

11 U.S.C. § 550(a).

At issue is whether AXA is an "initial transferee" or an immediate or mediate transferee under 11 U.S.C. § 550 to the extent the Transfers are avoidable under the Bankruptcy Code. The Transfers received by AXA consist of two parts – (1) the net amounts that were deposited in B'Nest's Policy Account after AXA deducted its premium charge, and (2) amounts that were withheld by AXA from the "premium" payments prior to depositing the net amounts into the Policy Account, such as the premium charges, and any other administrative and maintenance charges deducted by AXA from the funds in the Policy Account for maintaining the Policy and providing insurance coverage.

The Bankruptcy Code does not contain a definition of an "initial transferee." In determining what constitutes an "initial transferee," courts have generally adopted the "dominion and control test" set forth by the Seventh Circuit in *Bonded Financial Services, Inc. v. European American Bank*, 838 F.2d 890 (7th Cir. 1988), which held that "the minimum requirement of status as a 'transferee' is dominion over the money or other asset, the right to put the money to one's own purposes. When A gives a check to B as agent for C, then C is the 'initial transferee'; the agent may be disregarded." *Id.*, 838 F.2d at 893 (finding the bank, which received the debtor's funds with instructions to deposit those funds in the account of the debtor's principal, not to have dominion over the funds until the principal later instructed the bank to apply the funds to reduce a loan owed by the principal to the bank, and until the principal directed the repayment of the loan, the principal was free to invest the funds in his account in "lottery tickets or uranium stocks"). *See also*, *In re Ogden*, 314 F.3d 1190, 1204 (10th Cir. 2002) (holding that one must have received the funds and have full dominion and control over the funds for one's own use as opposed to receiving them in trust or as an agent for someone else in order to be an

initial transferee).

Similarly, the Eleventh Circuit has held that in deciding whether an entity had control, courts must "look beyond the particular transfers in question to the entire circumstance of the transactions." *Nordberg v. Societe Generale (In re Chase & Sanborn Corp.)*, 848 F.2d. 1196, 1199 (11th Cir. 1988) (quoting *In re Chase & Sanborn Corp.*, 813 F.2d 1177, 1181-82 (11th Cir. 1987)). Generally, when an entity receives money for the sole purpose of depositing it into a customer's account and never has actual control of the funds, it is not an initial transferee under 11 U.S.C. § 550 even if after the deposit is made, the customer gives the money to the bank to pay off a debt that it owes. However, if the entity received funds from a debtor to pay off a debt owed to the entity, then the entity has been found to have gained control of the funds. *Nordberg*, 848 F.2d. at 1200 (citing *Bonded Financial*, 838 F.2d at 892)).

The Second Circuit has followed the Seventh Circuit's "dominion and control" test by adopting the "mere conduit " test stating that:

> a commercial entity that, in the ordinary course of its business, acts as a mere conduit for funds and performs that role consistent with its contractual undertaking in respect of the challenged transaction, is not an initial transferee within the meaning of § 550(a)(1).

*In re Finley, Kumble Wagner, Heine, Underberg, Manley, Myerson & Casey*, 130 F.2d 52, 59 (2d Cir. 1997) (finding the debtor's insurance agent not to be an initial transferee where it had no discretion or authority over premium payments it received from the debtor and transmitted to the insurance company without taking any commissions). Where an entity does not deal directly with the debtor but "acts only as an innocent conduit of funds in a commercial transaction, that party should not be characterized as an initial transferee within the meaning of section 550." *In re Moskowitz*, 85 B.R. 8, 11 (E.D.N.Y. 1988) (finding an insurance company that held the

8

debtor's funds in escrow and used such to satisfy outstanding liens against a house not to be an initial transferee as it did not benefit from the transfer but merely facilitated the closing of the sale). The Trust argues that a more nuanced inquiry is required than a strict forward application of the mere conduit or dominion and control test in this situation because AXA was not simply an insurance broker, escrow agent, or financial intermediary, but the insurance company itself which issued an insurance policy in return for premium payments received from the Debtor. The Trust relies on *Bear Stearns Securities Corp. v. Gredd (In re Manhattan Investment Fund Ltd.)*, 397 B.R. 1 (S.D.N.Y. 2007), in which the court found Bear Stearns not to be a mere conduit but an initial transferee under § 550(a)(1) of funds transferred by a debtor into the debtor's margin account at Bear Stearns. In that case, the debtor engaged in short sales of technology stocks which are speculative transactions whereby a security not owned by the seller is sold in hopes that the price of the security will decline, thus permitting the seller to repurchase the security at a later time and make a profit. Generally, the security sold is borrowed from a broker, such as Bears Stearns, and an identical security is repurchased and returned to the broker. *Id.*, 397 B.R. at 4, n.3. The debtor was required to have a separate margin account and deposit 35% of the value of any short positions that were open on a given day (the "maintenance margin"). The account agreement between the debtor and Bears Stearns had certain features that protected Bear Stearns from the risk associated with the securities loaned to the Debtor such as (1) giving the brokerage a security interest in the margin account, (2) allowing Bear Stearns to set any level of maintenance margin for the account, (2) preventing the debtor from withdrawing monies from the account when there are open short positions supported by the account, and (4) permitting Bear Stearns to use the funds in the account to liquidate the debtor's open short positions with or

without the debtor's consent. These provisions reflected a debtor creditor relationship and were designed to ensure that Bear Stearns would never suffer losses on the loans of securities made to the debtor. Once funds were transferred into the margin account, Bear Stearns was able to keep the funds and use them to protect itself; thus, the provisions gave Bear Stearns dominion and control over the funds.

The Trust contends that AXA is not a mere conduit like a bank, a broker, or an escrow agent that simply transmitted funds it received. Rather, AXA is an insurance company that received the premium payments from the Debtor for providing life insurance and those premium payments that benefitted AXA. Moreover, like Bear Stearns, AXA placed restrictions under the Policy on B'Nest's ability to (a) over-fund the Policy Account, (b) surrender only a part of the Policy to the extent such actions would cause the Policy to fail to qualify as life insurance under applicable tax law or cause a decrease in the base policy face amount to less than $200,000, or (c) immediately receive any net cash surrender value withdrawal or loan amount for a period of up to six months. These restrictions gave AXA control and dominion over the funds in the Policy Account.

In determining whether AXA is a mere conduit and whether it had dominion and control over the Transfers, the Court considers all the facts and circumstances relating to the Policy and the Policy Account to determine whether AXA was a conduit. It is clear that the Policy is not a straightforward type of life insurance policy which would simply provide the beneficiaries with payment of the face amount of the Policy upon the death of the Insureds. Rather, the Policy was a special contract between B'Nest and AXA that provided not only an insurance benefit but also functioned as an investment vehicle by earning interest with respect to the net amount in the

Policy Account. Unlike traditional term insurance policies, as long as there were sufficient funds in the Policy Account while either Insured is alive, B'Nest need not make any premium payments to maintain the Policy in effect, or B'Nest could vary its "premium" payments.

Although AXA was the recipient of the Transfers from the Debtor, AXA's ability to exert control over the funds deposited in the Policy Account was limited by the terms of the Policy contract. None of the restrictions specified by the Trust enabled AXA to control and take the funds in the Policy Account for AXA's own discretionary use or protection. AXA was required to deposit the Transfers less premium charges in B's Nest Policy Account and the net funds in the Policy Account were subject to B'Nest's control. Unlike Bear Stearns, AXA did not have the ability or right to take any part of the funds in the Policy Account for its own use and benefit to protect itself. Other than the limited deductions for premium charges, and administrative and surrender charges that were agreed upon between B'Nest and AXA, AXA had no control over the funds in the Policy Account. The interest earned with respect to the net amount in the Policy Account was for the benefit of B'Nest and the beneficiaries of the Policy by increasing the cash surrender value of the policy and potentially the death benefit payable.

B'Nest had the right and ability to take out loans against the Policy for its own use based upon the value of the Policy Account, which it did on four occasions, or it could terminate the Policy for the Policy's cash surrender value. Unlike Bear Stearns, AXA had no authority to use the funds for its own purposes or to offset the loans taken out by B'Nest against the amounts in the Policy Account to pay itself back. Rather, AXA could only end the Policy if there were insufficient funds in the Policy Account to cover the administrative charges as they became due. Accordingly, AXA acted as a mere conduit with respect to the net amounts deposited into B's

11

Nest Policy Account because it had no dominion and control over the use of the funds in the Policy Account other than agreed upon deductions for the administrative charges. While AXA had the right to delay the payment of any net cash surrender value or the advance of a loan for a period of up to 6 months, AXA does not have the right to refuse to make the payment or advance. Based upon the terms in this Policy and the facts and circumstances surrounding the Policy, AXA is not an initial transferee with respect to the Transfers with respect to the net funds deposited into the Policy Account.

With respect to the premium charges deducted from the Transfers prior to the net funds being deposited into the Policy Account and the monthly administrative charges deducted from the Policy Account to maintain the Policy, AXA did gain control of those funds and those charges were for the benefit of AXA. However, whether AXA is deemed to be an initial transferee with respect to the premium and administrative charges depends upon the nature of the underlying obligation to pay these charges. There is no evidence to indicate they were not paid pursuant to the terms of the contract.

Commissions received by an intermediary are subject to 11 U.S.C. § 550 where the underlying obligation to pay such commissions lies with the debtor. *In re Florida Manufacturing & Distribution*, 484 B.R. 847 (Bankr. S.D. Fla. 2012) (monthly maintenance fees deducted by the intermediary were fraudulent where the intermediary had entered into a contract with the debtor entitling the intermediary to withdraw a monthly maintenance fee from funds deposited by the debtor into an account and disbursed by the intermediary to pay debtor's creditors). *cf. Finley, Kumble*, 130 F.3d at 59 (finding that while the debtor's insurance broker had the power to take a commission and that may be potentially significant, the court did not decide the issue

because no commission was received but the court also noted that "many and routine transactions entail service fees that may be deducted against the funds as they pass from hand to hand.")

Likewise, where the underlying obligation to pay a service fee or commission lies with the ultimate recipient of the funds who is the client or principal of the intermediary, and not the debtor, courts have deemed that an intermediary's deduction and retention of such service fee or commission is a transfer by the recipient in satisfaction of its obligation rather than a transfer by the debtor. Therefore, the intermediary's deduction and retention of its service fee or commission from the funds paid by the debtor prior to remitting the funds to the recipient of the intended funds did not render the intermediary to be an initial transferee under 11 U.S.C. § 550 even though the payment of the fee or commission was undertaken in one step rather than a two-step process. See *In re Railworks Corp.*, Nos. 01-64463 through 01-64485, 2012 Bankr. LEXIS 5863 (Bankr. D. Md. Dec. 21, 2012) (finding an agent's deduction of commissions owed by the non-debtor recipient from the transferred funds prior to payment of the remainder of the funds to the recipient rather than payment of the gross amount of the transfers to the recipient and then waiting for a separate commission check from the recipient is of no significance); *In re Hooker Investments, Inc.,* 155 B.R. 332, 341 (Bankr. S.D.N.Y. 1993); *In re Black & Geddes, Inc*., 59 B.R. 873, 875, n. 2 (Bankr. S.D.N.Y. 1986).

Here, AXA's ability to deduct and retain the premium and administrative charges from the Transfers and from the Policy Account is based upon a contractual relationship with B'Nest, the owner of the Policy, not the Debtor. The deduction for the premium charges from the Transfers prior to depositing the net funds in the Policy Account is simply an offset of B'Nest

obligation to pay the premium charges to AXA taken in one step rather than a two-step process of AXA deducting the premium charges from the funds once deposited into the Policy and such offset has been held to be of no significance. If the obligation to make the premium payment arose from a contractual obligation between the Debtor and AXA, then the outcome would potentially be different as AXA would then not be an intermediary but a direct beneficiary of the premium payments. That is not what the facts reveal here.

With respect to the administrative charges deducted from the Policy Account, it is clear that the funds from which the administrative charges were being deducted were in the dominion and control of B'Nest. B'Nest was free to do what it wanted with the funds in the Policy Account until the time AXA made its periodic deductions from the Policy Account for the administrative charges or any other charges under the Policy. Furthermore, like the premium charges, payment of the administrative charges is an obligation of B'Nest and not the Debtor. Thus, the payment of the administrative charges from B'Nest Policy Account satisfies B'Nest obligation to make these payments in order to keep the Policy in effect. Accordingly, AXA is not an initial transferee of the Debtor's funds with respect to the premium and administrative charges deducted by AXA, and these charges are not subject to avoidance under section 550(a)(1).

In addition, pursuant to 11 U.S.C. § 550(b), a trustee may not recover from any immediate or mediate transferee under 11 U.S.C. § 550(a)(2) that "takes for value, including satisfaction or securing of a present or antecedent debt, in good faith, and without knowledge of the voidability of the transfer avoided." 11 U.S.C. § 550(b)(1). In determining whether AXA "takes for value," courts have looked to see what value was provided by the transferee and such value need not be value given to the debtor. *Bonded Financial*, 838 F.2d at 987 (finding value

was provided by the bank where it released a share of its security interest in horses owned by the debtor's principal when the principal deposited the debtor's funds in his account at the bank and subsequently used the debtor's funds to satisfy a loan the principal owed to the bank); *Kirschenbaum v. Leeds Morelli & Brown P.C. (In re Robert Plan of New York Corp.)*, 456 B.R. 150, 161 (Bankr E.D.N.Y. 2011) (finding a law firm's deduction of its attorneys' fees from a settlement payment for work completed that was deposited by a debtor into the attorneys' escrow account for the benefit of the attorneys' client to be a transfer for value).

In this case, AXA provided value for the premium and administrative charges in the nature of maintaining the Policy in effect, and continuing its obligation to pay interest on the net amount in the Policy Account as calculated under the Policy terms and to pay out the death benefit on the Policy while the Policy remained in effect. In addition, there is no allegation in the Complaint or any evidence that AXA had any knowledge of the voidability of the Transfers. AXA would not have knowledge of the Debtor's financial condition because AXA's contractual relationship was with B'Nest. AXA would have no reason to know or investigate the Debtor's financial condition prior to accepting the funds transferred with respect to the Policy. Accordingly, 11 U.S.C. § 550(b) applies and recovery cannot be had against AXA as an immediate or mediate transferee under 11 U.S.C. § 550(a)(2).

## CONCLUSION

Based upon the foregoing, AXA was a mere conduit and did not have dominion and control over the Transfers; thus, AXA cannot be deemed to be an initial transferee under 11 U.S.C. § 550(a)(1). In addition, AXA is not an immediate or mediate transferee under 11 U.S.C.

§ 550(a)(2). Accordingly, AXA's Summary Judgement Motion is granted and this Complaint is dismissed.

So Ordered.



Dated: Central Islip, New York
June 24, 2013

Dorothy Eisenberg
United States Bankruptcy Judge